IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

A.S.M., *et al.*,                          *

    Petitioners,                       *

vs.                                        *     CASE NO. 7:20-CV-62 (CDL)

WARDEN, Stewart County                     *
Detention Center, *et al.*,
                                           *
    Respondents.
                                           *
_____
                                           *

O R D E R

    The Court presently has pending before it Petitioners' motion
for preliminary injunctive relief (ECF Nos. 28 & 70).  Petitioners
are immigration detainees at the Stewart Detention Center
("Stewart") and the Irwin County Detention Center ("Irwin"), which
are operated by private contractors under the auspices of the U.S.
Immigration and Customs Enforcement ("ICE").  Petitioners claim
that their continued detention at these facilities under current
conditions violates their constitutional rights and that they must
be released or, in the alternative, Respondents must be ordered to
institute measures that reasonably protect them from the risk of
infection with the coronavirus.  For the reasons explained in the
remainder of this Order, Petitioners' motion is denied.

BACKGROUND

## I.   The COVID-19 Pandemic

In early 2020, the general public became aware of an outbreak of a virus in Wuhan, China that has been designated in the scientific community as SARS-CoV-2 but is often referred to as "novel coronavirus" or the shorthand "coronavirus."  This virus can cause the disease known as "COVID-19."  The virus is generally believed to be spread by the transmission of body fluids through the respiratory tract, typically from a sneeze or cough.  But it can also survive on certain surfaces and be contracted through human contact with the contaminated surface and subsequent contact with the face in a manner that allows it to enter the respiratory tract through the nose or mouth.  If the virus produces COVID-19, the symptoms may include coughing, malaise, fatigue, fever, and respiratory distress, and it may cause death, particularly in persons with underlying medical conditions that make them vulnerable to respiratory distress.

The spread of the virus has risen to the level of a global pandemic.  In order to stave off further spread, national, state and local governments have declared national and local emergencies and encouraged (and in some cases ordered) that citizens remain in their homes, that businesses be closed, and that traffic from other countries into the United States be restricted.  The United States economy has essentially shut down for the last sixty days with

many people losing their jobs.  Unprecedented financial resources have been made available by the United States Congress through loans, direct payments to taxpayers, and other financial stimuli. The federal and state judiciaries have been forced to conduct proceedings remotely in order to minimize person-to-person contact.  Over 107,000 persons in the United States have lost their lives with an estimated 1.85 million having become sick from the disease.  With no vaccine presently available, the primary method of prevention includes an emphasis on identification of those who may be infected with the virus, social distancing, wearing masks in public, and aggressive hand hygiene.  Increased vigilance is vital for those at high risk because of compromised immune and respiratory systems and other severe underlying health conditions.

## II.  Response by ICE, Stewart, and Irwin

The coronavirus presents a particularly daunting challenge for prisons and detention centers where large numbers of detainees live in close proximity to each other.  The Centers for Disease Control and Prevention ("CDC") has made recommendations for reducing the risk of virus transmission in these types of facilities. *See* Isted Decl. Ex. 19, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Mar. 23, 2020), ECF No. 65-7 ["CDC Guidance"].  These recommendations address operational preparedness, prevention, and management. *Id.* at 5.  ICE attempts

to follow these recommendations.  Nevertheless, detainees in its facilities are not immune from infection.  Like other victims of COVID-19, some detainees in ICE facilities have contracted the coronavirus, developed COVID-19, and subsequently died.  As of May 26, 2020, twenty-two detainees at Stewart and seven detainees at Irwin have tested positive for COVID-19.  Fourth Washburn Decl. ¶ 22 (May 27, 2020), ECF No. 79 ["Washburn Decl."]; Musante Decl. ¶ 19, ECF No. 76.

Petitioners maintain that the CDC Guidance is not being followed at Stewart and Irwin.  They contend that this failure to follow the Guidance places them at great risk of being infected with coronavirus and developing serious health complications from COVID-19, including permanent injury and death.  They ask the Court to rescue them, preferably by releasing them from detention.  In the alternative, they seek court oversight of Stewart and Irwin to ensure that the CDC Guidance is followed.  The Court will briefly summarize some of the measures taken at Stewart and Irwin to contain the spread of coronavirus in these facilities.[1]

---

[1] The Court acknowledges that Petitioners have presented some evidence from themselves and other detainees disputing the claims of the administrations at Stewart and Irwin regarding measures being taken at the two facilities to ensure compliance with CDC Guidance.  While the Court does not doubt that 100% compliance is not being achieved, the Court finds that Petitioners have not carried their burden of showing a lack of substantial compliance.

A.   Procedures in Place at Stewart

As of May 26, 2020, Stewart has a population of 1,158 detainees, meaning the facility is operating at a reduced 57% capacity. Washburn Decl. ¶ 21. Stewart has resumed transferring, removing, and releasing detainees. But detainees arriving at Stewart are "subjected to symptom screening and temperature check before being admitted into the intake area." *Id*. ¶ 182. At Stewart, "[f]ollowing the booking process, detainees are isolated and housed in a dedicated housing pod for new intakes, where they remain in cohort quarantine status for a 7-14 day period." *Id*. ¶ 183. If a detainee in the cohort displays symptoms of COVID-19 or tests positive for it, the cohort's release date is extended fourteen days. *Id*. ¶ 187.

Stewart provides detainees access to sanitation supplies including disinfectants, hand sanitizer, and soap in every unit at the facility. *Id*. ¶¶ 117, 119, 125-26; Murray Expert Report 6, ECF No. 75-1 (noting detainees have access to hand sanitizer dispensers throughout the facility). Stewart also checks sanitation supplies daily and reorders them as needed. Washburn Decl. ¶¶ 113-114. Extra disinfection is performed on high touch areas in Stewart, and porters clean communal restrooms and showers throughout the day. *Id*. ¶¶ 132, 134. On May 4, 2020, Stewart received a floor-to-ceiling sanitization in all areas except food and medication storage areas. *Id*. ¶ 142.

Stewart posts educational materials about COVID-19 throughout its facility in multiple languages. *Id.* ¶ 68; *see also* Murray Expert Report 7. And it hosts town hall meetings with bilingual staff members to discuss the subject. Washburn Decl. ¶¶ 69-73.

As of April 10, 2020, Stewart staff and detainees have been required to wear masks except in showers, bunks, or while eating. *Id.* ¶ 150. Stewart distributes replacement masks to detainees weekly and masks may be obtained upon request as needed. *Id.* ¶ 151. Stewart reviews surveillance video to confirm employee compliance with personal protective equipment ("PPE") requirements, and staff have begun issuing disciplinary reports to detainees who refuse to wear masks. *Id.* ¶¶ 153-54.

Stewart suspended in-person visitation to the facility except for legal visitation. *Id.* ¶ 75. Staff, contractors, and visitors who enter Stewart are screened before entering and their body temperature is taken. *Id.* ¶ 76. Since April 10, 2020, individuals who enter Stewart must wear a mask. *Id.* ¶¶ 85, 87.

On March 31, 2020, sixty-seven detainees were moved into cohort housing areas that were designed to be protective housing for high-risk medically vulnerable detainees. *Id.* ¶¶ 160-61. If a detainee in the general population tests positive for COVID-19, he remains in the medical unit until he has been symptom-free for seventy-two hours. *Id.* ¶ 168. When possible, the original housing pod of the detainee who tests positive for COVID-19 or is

symptomatic of COVID-19 is placed on a fourteen-day cohort/quarantine status. *Id.* ¶ 175.

Stewart has instructed staff to maintain six feet of physical distance from detainees or other staff where possible. *Id.* ¶ 89. Detainee movement has also been restricted significantly to reduce COVID-19 exposure in hallways. *Id.* ¶¶ 90, 110. When non-cohorted detainees use mail services, commissary, and pill call, they are transported in groups of fewer than ten detainees and red tape has been placed on the ground to indicate that they should stand six feet apart in line. *Id.* ¶ 92. The medical unit and waiting room have also been designed to promote social distancing. *Id.* ¶¶ 94-96. Religious services and contact sports during recreation time have been suspended. *Id.* ¶¶ 103-04. And, "detainees assigned to bunk-beds have been instructed to lay in a 'crisscross' or 'head-to-toe' fashion, with one detainee's head at one end of the bunk, and the other detainee[']s head at the other end of the bunk, to create more distance should a detainee sneeze or cough." *Id.* ¶ 109. "Additionally, detainee housing assignments have been adjusted to place as much physical space as possible between detainees, considering other factors relating to security level and other medical and mental health needs." *Id.*

B.   Procedures in Place at Irwin

As of May 20, 2020, Irwin is operating at a reduced 53% capacity with only 503 ICE detainees. Third Paulk Decl. ¶ 4, ECF

No. 78 ["Paulk Decl."].  New detainees are screened at intake at Irwin and wear PPE during transport.  *Id*. ¶ 21.  Any new detainee who is symptomatic of COVID-19 is immediately referred to medical personnel.  *Id*.  Transferred detainees are placed into protective cohort housing for fourteen days.  *Id*. ¶ 22.  Detainees in cohort status are only transferred for necessary medical care, lack of quarantine space, or security concerns.  *Id*. ¶ 58.

If a detainee reports COVID-19 symptoms, medical staff assess the individual.  *Id*. ¶ 55.  And if medical staff find that symptoms do exist, the detainee is tested for COVID-19 and placed in medical isolation.  *Id*.  That individual's housing unit is then placed in cohort status for at least fourteen days.  *Id*.

Irwin provides free cleaning products to housing units.  *Id*. ¶ 48; Murray Expert Report 6 (noting that Irwin provides alcohol-based sanitizer in community areas).  All detainees have been provided with two cloth face masks, and additional masks are available for replacement.  Paulk Decl. ¶ 50.  Detainees are encouraged to wear face masks in community areas.  *Id*. "Recreational areas and the chow hall are thoroughly sanitized between uses employing a CDC recommended cleaning agent or one of similar efficacy, as are common use items, such as telephones and [video telecommunication] devices."  *Id*. ¶ 46.  "Open housing unit showers are sanitized and pressure-washed daily, and showers

in closed-cell housing units are sprayed as well." *Id.*   Irwin staff members must wear PPE, including masks and gloves. *Id.* ¶ 51.

Irwin staff have instructed multiple housing units on how to properly wash hands, maintain social distancing, and be aware of COVID-19-related issues. *Id.* ¶ 33.   Irwin has also posted signage in multiple languages throughout the facility to educate staff and detainees on COVID-19. *Id.* ¶¶ 33, 47; Murray Expert Report 7.

All non-professional visits at Irwin have been suspended, and professional visits are only permitted in non-contact visitation rooms or via Skype. Paulk Decl. ¶¶ 8, 15-16, 20.   Professionals are required to wear masks during visits. *Id.* ¶ 16.   And all entrants, including Irwin staff, are thoroughly screened before entering the facility through body temperature checks and COVID-19 questionnaires. *Id.* ¶¶ 9, 23.

Irwin officials have restricted the number of detainees who can eat at tables together in chow hall and staggered meals, recreation time, and other group activities to encourage social distancing. *Id.* ¶¶ 35-36, 38.   They have also posted signage regarding social distancing. *Id.* ¶ 37.   And they have "assign[ed] sleeping arrangements so detainees can sleep on alternate levels of adjacent bunks where possible, head-to-foot, to prevent the spread of COVID-19." *Id.* ¶ 40.

C.   Custody Re-Evaluations at Stewart and Irwin

As part of its overall management of its detainee population in light of COVID-19, "ICE has reviewed its detained 'at risk' population . . . to determine if detention remains appropriate, considering the detainee's health, public safety and mandatory detention requirements."  Moten Decl. ¶ 33, ECF No. 77; Musante Decl. ¶ 26.  For example, ICE released Petitioner A.S.M. pursuant to this re-evaluation on April 17, 2020.  Moten Decl. ¶ 163.  In addition, Respondents considered all remaining Petitioners, except one, for release pursuant to the preliminary injunction issued in the Central District of California case, *Fraihat v. U.S. Immigration & Customs Enforcement*, No. EDCV 19-1546 JGB (SHKx), 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020).  *See id.* ¶¶ 62, 78, 130, 145; Musante Decl. ¶¶ 36, 57, 82, 103, 122, 135.  Respondents declined to release Petitioners during this review for a variety of individualized reasons, including the respective danger they pose to the community and the high likelihood they will flee.  *Id.*

DISCUSSION

To obtain preliminary injunctive relief, Petitioners must establish the following: (1) that they have a substantial likelihood of succeeding on the merits; (2) that they face an imminent and substantial threat of irreparable harm unless relief is granted; (3) that the threatened injury to them outweighs the harm the relief may cause respondents; and (4) that the relief is

not against the public interest. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,* 51 F.3d 982, 985 (11th Cir. 1995).

Preliminarily, the Court finds, as it has found before, that it does not have jurisdiction to consider Petitioners' habeas corpus remedy and that Petitioners are not otherwise entitled to release from confinement. Release from detention is not available as a remedy for unconstitutional conditions of confinement claims. *See A.S.M. v. Donahue*, No. 7:20-CV-62 (CDL), 2020 WL 1847158, at *1-*2 (M.D. Ga. Apr. 10, 2020); *Vaz v. Skinner*, 634 F. App'x 778, 781 (11th Cir. 2015) (per curiam) (finding a writ of habeas corpus is "not the appropriate vehicle for . . . a claim challeng[ing] the conditions of confinement"); *Gomez v. United States*, 899 F.2d 1124, 1126 (11th Cir. 1990) ("The appropriate Eleventh Circuit relief from prison conditions that violate the Eighth Amendment during legal incarceration is to require the discontinuance of any improper practices, or to require correction of any condition causing cruel and unusual punishment. . . . [R]elief of an Eighth Amendment violation does not include release from confinement."). Even if an exception to that rule exists where the unconstitutional conditions cannot be remedied in some other way, the Court finds that, based on the present record, release from confinement is not the only way to remedy the alleged unconstitutional conditions of confinement here. Petitioners essentially concede this fact by suggesting that if Respondents followed the CDC Guidance, the risk

of infection would be substantially reduced. Accordingly, Petitioners are not entitled to release from detention even if the current conditions violate their constitutional rights.

Regarding Petitioners' alternative request for declaratory or injunctive relief, in order to show a substantial likelihood of success on the merits, Petitioners must point to a constitutional violation. They allege three separate Fifth Amendment violations. The first two are closely connected. Petitioners claim that the current conditions of confinement amount to unconstitutional punishment of civil detainees and deliberate indifference to the health and safety of detainees in violation of the Fifth Amendment. Petitioners' third claim, which they describe as an *Accardi* claim, alleges that Respondents' failure to comply with the CDC Guidance violates their Fifth Amendment right to due process. The Court addresses each claim in turn.

## I. Unconstitutional Punishment

Conditions of confinement violate the Fifth Amendment Due Process Clause when they "amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).[2]  "[W]hether a condition of . . . detention amounts to punishment turns on whether the condition is imposed for the purpose of punishment or whether it is incident to some legitimate government purpose." *Jacoby v.*

---

[2] For purposes of this Order, the Court assumes without deciding that the Fifth Amendment impermissible punishment standard would apply to immigration detainees' conditions of confinement claims.

*Baldwin Cty.*, 835 F.3d 1338, 1345 (11th Cir. 2016) (quoting *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004)).   Petitioners can show punishment either through an express intent to punish or courts "'may infer that the purpose of the governmental action is punishment' if the 'restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless.'" *Id.* (quoting *Bell*, 441 U.S. at 539).   When conducting this analysis, the Court first "must ask whether any 'legitimate goal' was served by the [facility's] conditions." *Id.*  Next, the Court "must ask whether the conditions are 'reasonably related' to that goal." *Id.*

No evidence exists in the present record suggesting any "express intent" to punish Petitioners.   And it cannot be reasonably disputed that Respondents have a legitimate interest in detaining aliens to ensure that they appear for removal and for public safety purposes. *See, e.g., Demore v. Kim*, 538 U.S. 510, 523 (2003) ("[T]his Court has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process."); *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) ("Detention during [immigration] proceedings gives immigration officials time to determine an alien's status without

running the risk of the alien's either absconding or engaging in criminal activity before a final decision can be made.").[3]

Petitioners argue, however, that their continued detention in the current conditions is not reasonably related to the government's interest because of the risk that they will contract the coronavirus in detention when alternatives to detention are reasonably available.  The Court rejects this argument.  Detention always carries with it the risk of communicable disease outbreak given the close communal living spaces in such facilities.  Based upon the present record, the Court finds that, although the coronavirus pandemic is a particularly daunting challenge, Respondents have taken extensive and reasonable measures to reduce the risk of coronavirus spread at Stewart and Irwin.  Petitioners' continued detention there is necessary and certainly does not cross the line from civil detention to impermissible punishment.  For these reasons, their detention does not constitute an impermissible punishment in violation of the Fifth Amendment.

## II. Deliberate Indifference

Petitioners' second claim asserts that they are being denied the level of care required under the Eighth Amendment's standard

---

[3] Petitioners claim that Respondents have openly admitted to an illegitimate purpose in detention—general deterrence—based on comments in a press release by the Acting Director of ICE.  Even if these comments are construed as evidence of one illegitimate motive, they do not negate all of the other undisputed legitimate interests in detention.

prohibiting cruel and unusual punishment.[4]  This standard "has two components: one objective and the other subjective." *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020).  "First, to satisfy the 'objective component,' the [detainee] must show 'an objectively intolerable risk of harm.'"  *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 846, (1994)).  "He must show that the challenged conditions were 'extreme' and presented an '"unreasonable risk of serious damage to his future health" or safety.'"  *Id.* (quoting *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004)).  It is doubtful that Petitioners have shown a substantial likelihood that they can satisfy this objective prong. While COVID-19 certainly presents a risk of serious harm to persons who are detained in any prison or detention center, the Court cannot find from the present record that this risk is objectively unreasonable at Stewart or Irwin in light of the measures that have been implemented there.  But even if Petitioners could show a substantial likelihood of satisfying this objective prong, they clearly have failed to satisfy the subjective element of this claim.

"[T]o satisfy the 'subjective component,' the [detainee] must show that the . . . official acted with deliberate indifference."

---

[4] The Fifth Amendment requires facilities to provide certain detainees a level of care that not only meets the impermissible punishment standard but also meets the standard applied to Eighth Amendment claims.  *See Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1574 (11th Cir. 1985).

*Id.* at 1088-89 (quoting *Chandler*, 379 F.3d at 1289).   An official
"acts with deliberate indifference when he 'knows of and disregards
an excessive risk to inmate health or safety.'"   *Id*. at 1089
(quoting *Farmer*, 511 U.S. at 837).   An "official may escape
liability for known risks 'if [he] responded reasonably to the
risk, even if the harm ultimately was not averted.'"   *Id*. (quoting
*Chandler*, 379 F.3d at 1290).   "Deliberate indifference requires
the defendant to have a subjective 'state of mind more blameworthy
than negligence,' . . . closer to criminal recklessness."   *Id*.
(quoting *Farmer*, 511 U.S. at 835).

Here, Petitioners have not pointed to sufficient evidence of
Respondents' deliberate indifference.   The Eleventh Circuit's
recent COVID-19 conditions of confinement decision in *Swain v.
Junior* is instructive.   Concluding that the inmates in *Swain* likely
had not shown deliberate indifference, the Eleventh Circuit found:
(1) an increase in COVID-19 infections is not proof of deliberate
indifference; (2) the measures that the defendants were taking
(including increased screening, providing protective equipment,
adopting social distancing when possible, quarantining symptomatic
inmates, and enhancing cleaning procedures) demonstrated they were
taking the risk of COVID-19 seriously; (3) although it was
impossible for defendants to implement social distancing measures
effectively in all situations, the district court cited no evidence
to establish that the defendants subjectively believed that the

measures they were taking were inadequate; (4) although the social distancing policies were not uniformly enforced, the district court made no finding that defendants ignored or approved of the lapses in enforcement; and (5) "the inability to take a positive action [like social distancing] likely does not constitute 'a state of mind more blameworthy than negligence.'" *Id.* at 1089 (quoting *Farmer*, 511 U.S. at 835). Based upon these findings, the Court concluded that the district judge abused her discretion when she granted preliminary injunctive relief.

The circumstances described in the Court of Appeals' *Swain* opinion are remarkably similar to those existing at Stewart and Irwin. Respondents have taken extensive measures to prevent the spread of coronavirus, and the Court finds that they have substantially complied with the CDC's recommendations. Even if Petitioners can point to isolated violations of the CDC Guidance and even if that Guidance is the general standard of care, such breaches do not support a constitutional violation. *See Steele v. Shah,* 87 F.3d 1266, 1269 (11th Cir. 1996) (finding that for there to be a constitutional violation, there must be more than a breach of the applicable standard of care; there must be deliberate indifference which requires a finding of subjective awareness of the risk accompanied by a conscious disregard of it). The present record does not support a finding that Petitioners have a

substantial   likelihood   of   succeeding   on   their   deliberate
indifference claim.

**III. *Accardi* Claim**

      Petitioners   maintain   that   they   are   entitled   to   the   relief
they   seek   even   if   they   cannot   prove   that   the   conditions   of
confinement amount to punishment or that Respondents have acted
with  deliberate  indifference  to  their  health  and  safety.    They
contend that if they can prove that Respondents have failed to
follow  CDC  Guidance,  then  that  failure  violates  their  due  process
rights, and that due process violation can be redressed by altering
their  conditions  of  confinement,  either  by  releasing  them  from
detention or modifying the confinement conditions.   Petitioners
rely upon *United States ex rel. Accardi v. Shaughnessy*, 347 U.S.
260 (1954) for this proposition.   Therefore, an analysis of that
decision is the appropriate place to start.

      The  Supreme  Court's  decision  in  *Accardi*  is  not  remarkable.
But  the  extension  of  it  by  some  courts  has  created  confusion  and
provided   ammunition   for   creative   lawyers.     Lifting   isolated
phrases from the various opinions is unhelpful.   The fundamental
first  step  is  to  completely  understand  what  the  Supreme  Court
decided, which, as explained in the following discussion, is a far
cry from Petitioners' claim in reliance upon it.

      At  its  core,  *Accardi*  involved  procedural  due  process.   The
Supreme Court held that when an agency adopts regulations pursuant

to proper statutory delegation that specify the procedures that
shall be followed in matters before the agency, the agency must
follow its own procedures.   347 U.S. at 268.   An examination of
the facts helps place *Accardi* in the proper context and
demonstrates how it is distinguishable from the claim asserted
here.   Edward Shaughnessy, who was born in Italy and entered the
United States by train from Canada without immigration inspection
or a visa, applied to the Board of Immigration Appeals for the
suspension of his deportation under the Immigration Act.   Prior to
the Board's decision on his application, the Attorney General of
the United States released a confidential list of "unsavory
characters" whom he believed should be deported.   That list was
publicly disclosed and circulated to the members of the Board.
Mr. Shaughnessy was on that list.   Mr. Shaughnessy claimed that
the release of this "unsavory characters" list amounted to a
prejudgment of his right to have his deportation suspended by the
Board and made his right to fair consideration of his application
by the Board impossible.   *Id*. at 264.   When his application was
denied, he filed a petition for habeas corpus.   As stated by the
Supreme Court, the "crucial question [was] whether the alleged
conduct of the Attorney General deprived petitioner of any of the
rights guaranteed him by the statute or by the regulations issued
pursuant thereto."   *Id*. at 265.

The Supreme Court began its analysis by noting that the regulations in question had been properly promulgated pursuant to statutory delegation and were published in the Code of Federal Regulations. *Id*. at 265 n.6. It then stated the unremarkable principle that "[r]egulations with the force and effect of law supplement the bare bones of [the statute]." *Id*. at 265. The Supreme Court confirmed that the applicable regulations "prescribe the procedure to be followed in processing an alien's application for suspension of deportation." *Id.* Thus, Congress statutorily delegated authority to the appropriate executive agency to promulgate regulations that would set out the procedure for such proceedings. And that agency did so. Those regulations mandated that the Board of Immigration Appeals shall exercise its own judgment when considering appeals such as Mr. Shaughnessy's. Therefore, the regulations prevented the Attorney General from sidestepping the Board when making determinations on applications for suspension of deportation. As interpreted by the Supreme Court, Mr. Shaughnessy's petition for habeas corpus "charge[d] the Attorney General with precisely what the regulations forb[ade] him to do: dictating the Board's decision." *Id*. at 267. When the Attorney General publicly disclosed the list of unsavory persons that he planned to deport and circulated the list to the Board, he, as a practical matter, deprived Mr. Shaughnessy of a fair hearing in which the Board was required by the regulations to

20

exercise its own independent discretion. *Id.* The Court concluded that if Mr. Shaughnessy proved his allegations, he could establish that he was denied the "due process required by the regulations in such proceedings." *Id.* at 268. Accordingly, the denial of his petition for habeas corpus was reversed.

The principle announced in *Accardi* has been applied in this Circuit. *See, e.g.*, *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1361 (11th Cir. 2018) (finding the Social Security Administration is bound in administrative appeals by its own interpretive rulings regarding how administrative law judges must weigh certain evidence when those interpretive rulings are made pursuant to authority provided by properly promulgated regulations and when failure to enforce the regulation would adversely affect substantive rights of individuals); *United States v. Teers*, 591 F. App'x 824, 840 (11th Cir. 2014) (suggesting, although finding it unnecessary to decide, that an *Accardi* due process violation requires that the person "reasonably relied on the agency regulations promulgated for his guidance or benefit and suffered substantially because of their violation by the agency"); *Jean v. Nelson*, 727 F.2d 957, 976, 978-979 (11th Cir. 1984) (finding that the court had authority to review whether the immigration officials involved in denying petitioner's request for parole acted within the scope of their delegated powers and, in making this determination, the court may consider whether the decision to deny

parole was consistent with the statutory grant of discretion by Congress, the regulations promulgated by the agencies involved, and the policies which had been established by the President and Attorney General).

Relying upon snippets extracted from distinguishable judicial opinions, Petitioners seek to unmoor *Accardi* from its analytical anchor—due process.  Petitioners make no contention that some "process" was due or denied them.  Instead, they seek to convert a constitutional conditions of confinement claim into a negligence-type action, using operating policies for maintaining safe and healthy facilities as the standard of care.  Petitioners have pointed the Court to no circuit court opinion holding that an executive branch agency's operational policy relating to conditions of confinement for its detainees is the type of regulation contemplated by *Accardi* to support a due process violation.  Recognizing its duty to apply the law and not make it up, the Court declines Petitioners' invitation to extend *Accardi,* particularly given that it would have so little company in doing so.[5]

---

[5] The Court acknowledges that one district judge in this circuit has recognized an *Accardi* claim under similar circumstances.  *See Gayle v. Meade*, No. 20-21553-CIV, 2020 WL 2086482 (S.D. Fla. Apr. 30, 2020), *order clarified,* No. 20-21553-CIV, 2020 WL 2203576 (S.D. Fla. May 2, 2020). For the reasons explained in today's order, the Court finds that judge's reasoning unpersuasive, as have other judges in this circuit.  *See Gayle v. Meade*, No. 20-21553-CIV, 2020 WL 1949737, at *28 (S.D. Fla. Apr. 22, 2020), *report and recommendation adopted in part,* No. 20-21553-CIV, 2020 WL 2086482 (S.D. Fla. Apr. 30, 2020), *order clarified,* No. 20-21553-CIV,

The contrast between *Accardi* and the present case is striking. Unlike the formally promulgated and properly delegated regulation in *Accardi,* the CDC Guidance that ICE voluntarily agreed to try to follow here was never promulgated as a regulation pursuant to the Administrative Procedures Act.  Furthermore, Petitioners have not explained the source of statutory authority that would even permit such agency rule-making delegation under these circumstances. Even if an *Accardi*-type claim may theoretically exist absent a formally adopted regulation, the voluntary decision to follow non-binding "guidance" from another agency of the Executive Branch certainly does not for *Accardi* purposes bind the agency that chooses to follow the guidance.

The Court recognizes that ICE, Stewart, and Irwin vaguely indicated an intent to be bound by CDC guidelines.  As Petitioners note, Respondents operate Stewart pursuant to ICE's 2011 Performance-Based National Detention Standards ("2011 Standards"), as amended in 2016, which contemplate that "[CDC] guidelines for the prevention and control of infectious and communicable diseases shall be followed" and "[f]acilities shall comply with current and future plans implements by federal, state or local authorities

---

2020 WL 2203576 (S.D. Fla. May 2, 2020) (magistrate judge's finding that Petitioners were not likely to succeed on their *Accardi* claim given the substantial amount of flexibility in the CDC Guidance); *Matos v. Lopez Vega*, No. 20-CIV-60784-RAR, 2020 WL 2298775, at *12 (S.D. Fla. May 6, 2020) (disagreeing with the conclusion in *Gayle* and finding Respondents did not violate the CDC Guidance by failing to space bunks six-feet apart given the non-mandatory language in the Guidance).

addressing specific public health issues including communicable disease reporting requirements." Isted Decl. Ex. 44, 2011 Standards §§ 4.3(2)(10), 4.3(V)(C)(1), ECF No. 65-12, at 7, 10-11. And Respondents operate Irwin pursuant to ICE's 2008 Performance-Based National Detention Standards ("2008 Standards"), and those standards also specify that "[f]acilities shall comply with current and future plans implemented by federal, state or local authorities addressing specific public health issues including communicable disease reporting requirements." Isted Decl. Ex. 43, 2008 Standards § 4.22(V)(C)(1), ECF No. 65-11 at 7. ICE also released agency guidance on April 10, 2020 stating that dedicated and non-dedicated ICE detention facilities must comply with the CDC Guidance. Isted Decl. Ex. 24, ICE Enforcement and Removal Operations: COVID-19 Pandemic Response Requirements 5, ECF No. 65-8. But the mere voluntary decision to try to operate its detention facilities consistent with the best available practices, as evidenced by the CDC Guidance, does not subject Respondents to an *Accardi* conditions of confinement claim.

Abundant evidence exists that the CDC did not intend to bind facilities by its Guidance. For example, the Guidance leaves facilities significant discretion in choosing how to adapt the recommendations to their needs. The front page of the Guidance states in bold: "**The guidance may need to be adapted based on individual facilities' physical space, staffing, population,**

24

**operations, and other resources and conditions**." CDC Guidance 1. The next page provides, "[**a]dministrators and agencies should adapt these guiding principles to the specific needs of their facility**." *Id*. at 2. And it explains that "[t]he majority of the guidance . . . is designed to be applied to any correction or detention facility, either as written *or with modifications based on a facility's individual structure and resources*." *Id.* at 5 (emphasis added). The Guidance is also full of qualifiers and non-mandatory language. *See, e.g.*, *id.* at 11 ("*If space allows*," facilities should "reassign bunks . . . *ideally* 6 feet." (emphasis added)); *id*. at 14 ("*If possible, consider . . . .*" (emphasis added)); *id*. at 3 ("*Ideally . . . .*" (emphasis added)). Additionally, the Guidance was implemented early in a pandemic when information about best practices was continually evolving and, therefore, binding facilities to strictly follow the best practices as they were known at that time would have been unwise. And, finally, the Guidance was not promulgated pursuant to a formal notice and comment rulemaking process. These circumstances suggest that the CDC likely did not intend to bind facilities through its Guidance. These guidelines are simply suggested best practices based on the best available evidence known at the time of their release. Their adoption by ICE does not make them anything more than that. ICE simply decided that it would follow these recommendations in its facilities. They became part of their

operational guidelines.  It is absurd to suggest that any time a detention facility fails to follow an internal operating procedure that a detainee can file a lawsuit in federal court. "Where . . . regulations . . . simply function as internal operating instructions, . . . they are deemed to be solely for in-house agency use and are not judicially enforceable against the agency." *First Ala. Bank N.A. v. United States*, 981 F.2d 1226, 1230 n.5 (11th Cir. 1993); s*ee Wilderness Soc. v. Norton*, 434 F.3d 584, 595-96 (D.C. Cir. 2006) (finding an agency's "management policies" constituted non-binding internal guidance by looking at the language of the policy, the fact that the policy reserved agency discretion to change or reject the policy, and the fact that the policy did not go through notice and comment rulemaking).

The adopted CDC Guidance is simply not the type of mandatory "regulation" contemplated in *Accardi*.  Respondents' decision to try to follow the CDC Guidance does not somehow convert operational guidelines into procedural guarantees with due process implications.  To hold otherwise would establish a standard for detention centers and prisons to meet that is far more rigorous than well accepted constitutional requirements.  Every federal detention facility and prison in the country would be subjected to an *Accardi* claim any time they failed to follow an operational procedure.  It seems clear that the Justices who decided *Accardi* would have never contemplated this consequence of their straight-

forward attempt to make sure Mr. Shaughnessy had the right to have his application heard independently by the Board of Immigration Appeals as the properly promulgated procedural regulations required. Moreover, it seems even clearer that neither the CDC nor ICE ever dreamed that by adopting these best practices, they were establishing a *guarantee* that these practices were going to be followed, and if they were not, they would be deemed to have violated a detainee's right to due process.

Petitioners' arguments fail for perhaps an even more fundamental reason. They cannot explain how a failure to follow a policy designed to reduce transmission of an infectious disease implicates procedural due process. *Accardi* involved a procedure that the agency failed to follow which resulted in the denial of a fair hearing. Other *Accardi* type cases in this Circuit address situations in which an agency failed to follow certain formally adopted procedures that are designed for the benefit of persons relying upon them. The Guidance here has nothing to do with this type of procedural process. These substantive guidelines suggest how a detention facility can be maintained in a safe and healthy manner. While the CDC guidelines are certainly relevant to Petitioners' constitutional condition of confinement claims, they have no relevance to whether Petitioners received procedural due process. Quite simply, Petitioners' claim is not authorized under *Accardi* or its progeny.

27

Even if an imaginative judge could distort *Accardi* to theoretically apply here, Petitioners have not shown based on the present record a substantial likelihood that the CDC Guidance has actually been "violated."   As previously explained, the CDC Guidance reiterates numerous times that facilities will need to adapt the principles in the Guidance to meet their specific needs. CDC Guidance 1, 2, 5.   Thus, as their name confirms, these principles are guidance and not mandated directives.

Consistent with the flexible nature of the Guidance, most of the provisions that Petitioners claim Respondents are violating are phrased as recommendations, not requirements.   For example, Petitioners complain that the bunk beds are not six feet apart and that detainees cannot maintain six feet of separation in dining areas, but the CDC Guidance does not mandate social distancing at all times in all situations.   The Guidelines provide that "*[i]f space allows*," facilities should "reassign bunks to provide more space between individuals, *ideally* 6 feet or more in all directions."   *Id.* at 11 (emphasis added).   And the Guidance recognizes that social distancing "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff.   Not all strategies will be feasible in all facilities."   *Id.*   As another example, Petitioners complain that Respondents are only quarantining new intakes for five to six days, but the provision of the CDC Guidance Respondents are accused

of violating says "*[i]f possible, consider* quarantining all new
intakes for 14 days before they enter the facility's general
population." *Id.* at 14 (emphasis added). Again, the Guidance
does not mandate such action. And, as a final example, Petitioners
complain about Respondents' use of cohorting to medically isolate
detainees, but the CDC Guidance does not prohibit such conduct.
It only states that "*[i]deally*, cases should be isolated
individually, and close contacts should be quarantined
individually. However, some . . . detention centers do not have
enough individual cells to do so and must consider cohorting as an
alternative." *Id.* at 3 (emphasis added).

Petitioners also argue that Respondents continue to transfer
detainees in violation of CDC Guidance. The CDC Guidance advises
facilities to "[r]estrict transfers of . . . detained persons to
and from other jurisdictions and facilities unless necessary for
medical evaluation, medical isolation/quarantine, clinical care,
extenuating security concerns, or to prevent overcrowding." *Id.*
at 9. Both Irwin and Stewart concede that they have resumed
transferring and removing detainees under limited circumstances.
Contrary to Petitioners' interpretation of the applicable
Guidance, Respondents may consistent with that Guidance adapt
provisions based on Stewart and Irwin's "physical space, staffing,
population, operations, and other resources and conditions." *Id.*
at 1. By resuming transfers of detainees but incorporating

heightened screening and health safety precautions in the transfer process, Respondents reasonably adapted the CDC's Guidance on transfers.[6]

In summary, creative lawyering cannot reduce the heavy burden that a detainee must carry when asserting a conditions of confinement claim. A detainee must establish that the conditions amount to impermissible punishment or that Respondents have demonstrated a deliberate indifference to the detainee's health

---

[6] The Court also rejects Petitioners' claim based on Stewart and Irwin's alleged failure to conduct custody re-evaluations for Petitioners despite ICE's Guidance. *See* U.S. Immigration & Customs Enforcement, *Updated Guidance: COVID-19 Detained Docket Review* 2 (Apr. 4, 2020), https://www.ice.gov/doclib/coronavirus/attk.pdf (directing field officer directors and deputy field officer directors to identify all detainees who have certain health conditions, ensure the conditions are still present, and "review [those] case[s] to determine whether continued detention remains appropriate in light of the COVID-19 pandemic"); U.S. Immigration & Customs Enforcement, *ERO COVID-19 Pandemic Response Requirements* (Version 1.0, April 10, 2020), at 14, https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf. Petitioners do not believe that they were identified for custody re-evaluation or received meaningful individualized custody reviews because they did not receive medical evaluations and were not given the opportunity to provide supplemental medical records concerning their risk factors. They ask the Court to order Stewart and Irwin to conduct meaningful custody re-evaluations for them. To the extent Petitioners claim that the ICE Guidance constitutes a regulation that Stewart and Irwin were required under *Accardi* to follow, the Court notes that they have not provided any non-speculative evidence that Respondents failed to conduct these evaluations for detainees who met the Guidance's qualifications and nothing in the ICE Guidance indicates that Stewart and Irwin were required to provide detainees new medical evaluations or opportunities to supplement medical records when conducting these custody reviews. Therefore, they are unlikely to succeed on *Accardi* claims pursuant to the ICE Guidance. And, they are unlikely to succeed on any argument that Respondents' failure to conduct a custody re-evaluation for them otherwise violates the Constitution because, as previously discussed, Stewart and Irwin's continued detention of individuals does not constitute impermissible punishment or deliberate indifference.

and safety.  While substantial deviations from an accepted standard of care based upon violations of operational policies may be considered in determining whether this burden has been carried, the mere violation of such non-binding policies does not give rise to a separate stand-alone *Accardi* claim.

CONCLUSION

The Court is sensitive to Petitioners' predicament.  Their legal status has placed them in an unenviable position.  But the Court has no authority to act as their caretaker, unless their legal rights have been violated.  Based on the present record, the Court cannot make that finding.  Petitioners have failed to demonstrate a substantial likelihood that they will be able to prove that they are being subjected to unconstitutional conditions of confinement that can only be remedied by their release from detention.  Therefore, the Court does not have jurisdiction over their claims for immediate habeas corpus relief, and they are not otherwise entitled to preliminary injunctive relief that requires their release from detention.  Furthermore, because Petitioners have also failed to demonstrate a substantial likelihood that they will be able to prove that they are being subjected to impermissible punishment, that Respondents have been deliberately indifferent to their safety and health, or that they have a viable *Accardi* claim, they are not entitled to any other injunctive or

31

declaratory relief.    Accordingly,  Petitioners' motion  for

preliminary injunction is denied in its entirety.[7]

IT IS SO ORDERED, this 3rd day of June, 2020.

S/Clay D. Land
_____
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA

---

[7] The Court finds it unnecessary to address the other requirements for
obtaining preliminary injunctive relief in light of the Court's
conclusion that Petitioners have failed to demonstrate a substantial
likelihood of succeeding on the merits of their claims.